**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIE ULYSESS GRANT,<br><br>                      Petitioner,<br><br>v.<br><br>RICK HILL, Warden, et al.,<br><br>                    Respondents. | Case No. 3:11-cv-03015-JAH-DEB<br><br>**ORDER:**<br><br>**1) DENYING PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>**2) DENYING CERTIFICATE OF APPEALABILITY** |

## I.  INTRODUCTION

Petitioner Willie Ulysess Grant ("Grant" or "Petitioner"), a state prisoner represented by counsel, has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."). (*See* Am. Pet., ECF No. 67.) The Court has read and considered the Petition, [ECF No. 67], the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF Nos. 75, 75-1], the Traverse [ECF No. 85], the lodgments and other documents filed in this case, and the legal arguments presented by both parties. For the reasons discussed below, the Court **DENIES** the Petition and **DENIES** a Certificate of Appealability.

/ / /

/ / /

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35–36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recited the facts as follows:

> On April 7, 2006, Lawrence Laymon went to Grant's apartment where he met with Grant and Jason Rochelle. Grant told Laymon that he wanted to rob Ace Parking (Ace) where Laymon worked as a parking lot attendant. Grant showed Laymon a wig Grant could use as a disguise; Rochelle added that he could get a gun. Laymon was unwilling to participate in any robbery of an Ace parking lot, but believed, based on the conversation, that Grant "was going to . . . hit one of the lots."

> Later that day, Laymon returned to his assigned Ace parking lot where he worked collecting cash and issuing tickets with Bryan Dawson, another Ace employee. Laymon received a call from Rochelle, where Rochelle asked Laymon how much money he had, and implied that Rochelle was going to "snatch [him] up" in a fake robbery. At the end of his shift, Laymon called his girlfriend, Patricia Ebarb, to give him a ride to the Ace office. He also called Rochelle to tell him that he was leaving the lot. Laymon told Rochelle that Dawson had no money since a supervisor had already picked up the proceeds from the lot, and that Laymon himself only had a few hundred dollars. Laymon left the lot around 8:00 p.m. At approximately the same time, Dawson also left the lot, driving his own car, heading to the downtown Ace office.

> Cell phone records indicated that shortly after receiving Laymon's call, Rochelle made several calls to Grant, and that both Rochelle and Grant were in the downtown area.

> After driving Laymon to the Ace office, Ebarb parked her car across the street from the office. Laymon saw that Dawson had parked inside the Ace office parking lot. As Laymon was walking across the street to the Ace office, he saw Rochelle driving out of the lot where Dawson had parked.

/ / /

Ace employee Derrick Lyons let Laymon into the office. As the door was opened, Laymon heard a "loud noise" that sounded like a gunshot or a car backfiring. Soon after, as Laymon was filling out paperwork to complete his shift, Ebarb began knocking on the office door. She stated that there was someone crying for help. Ace employees, including Laymon, exited and found Dawson unconscious and bleeding in the parking lot next to the Ace office. Police and paramedics soon arrived. Dawson died at the hospital the next morning of a single gunshot wound to the abdomen.

After Laymon learned that Dawson had died, he went to Grant's apartment to confront him. Laymon said to Grant and Rochelle, "Don't you all know that you killed that boy?" Grant and Rochelle said nothing at first; then Grant responded, "He did not want to give up the money." Laymon then asked if they even got any money, and Grant said, "No."

(Resp't's Lodgment No. 3, ECF No. 8-3 at 2–4.)

## III. PROCEDURAL BACKGROUND

On July 25, 2006, the San Diego County District Attorney's Office filed an Information charging Willie Ulysses Grant with one count of murder, a violation of California Penal Code § 187(a). (Pet'r's Lodgment No. 1, ECF No. 51-1 at 1–10.)[1] The information also alleged that Grant "intentionally and personally discharged a firearm, and proximately caused . . . death to a person (other than an accomplice) within the meaning of Penal Code section 12022.53(d)." (*Id.* at 10.) Following a jury trial, Grant was convicted of first degree murder. (*Id.* at 87.) The jury also found that Grant had personally discharged a firearm in the commission of the offense. (*Id.*)

Grant appealed his conviction to the California Court of Appeal for the Fourth Appellate District. (Resp't's Lodgment No. 1, ECF No. 8-3.) The California appellate court affirmed Grant's conviction in a written opinion. (*Id.*) Grant then filed a petition for review in the California Supreme Court, which was summarily denied. (Resp't's Lodgment No. 2,

---

[1] Jason Shawn Rochelle was charged as Grant's codefendant. (Pet'r's Lodgment No. 1, ECF No. 51-1 at 9–10.) The information also alleged that Rochelle, "although not personally armed with a firearm, was himself a principal in the commission . . . of the [murder] . . . within the meaning of Penal Code section 12022(a)(1)." (*Id.* at 10.)

ECF No. 8-4.) Grant sought review by the United States Supreme Court, which was denied. (Resp't's Lodgment Nos. 3–4, ECF Nos. 8-5–8-6.)

Grant next filed a petition for writ of habeas corpus in the San Diego Superior Court, which was denied in a written opinion. (Resp't's Lodgment Nos. 5–6, ECF Nos. 8-7–8-8.) He then filed a petition for writ of habeas corpus in the California Court of Appeal, which was denied in a written opinion, (Resp't's Lodgment Nos. 7–8, ECF Nos. 8-9–8-10), and a second petition for writ of habeas corpus in the California Court of Appeal, which was also denied in written opinion. (Resp't's Lodgment Nos. 9–10, ECF Nos. 8-11–8-12.) He then filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied. (Resp't's Lodgment Nos. 11–12, ECF Nos. 8-13–8-14.)

Grant filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C § 2254 in this Court on December 23, 2011. (ECF No. 1.) Respondent filed a motion to dismiss the Petition on March 2, 2012, which was granted on March 4, 2013. (ECF Nos. 12, 14.) Grant appealed and on August 14, 2017, the Ninth Circuit Court of Appeals reversed the dismissal in a published opinion. (ECF No. 29; *Grant v. Swarthout*, 862 F.3d 914 (9th Cir. 2017).) Grant was appointed counsel who filed a Motion to Supplement Petition and a Motion for Stay, which were granted. (ECF Nos. 33, 50, 52–53, 55.) After exhausting new claims in state court, Grant filed an Amended Petition. (ECF No. 67.) Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer on August 18, 2021. (ECF No. 75, 75-1.) Grant filed a Traverse on February 15, 2022. (ECF No. 85.)

## IV. ANALYSIS

Grant raises five grounds in his Petition. In grounds one, two and three, he contends the state court's denial of his contentions that the prosecution violated his due process rights by withholding material, exculpatory evidence and by presenting false evidence was contrary to, or an unreasonable application of, clearly established Supreme Court law; he also claims the state court's denial of these claims was based on an unreasonable determination of the facts. (Pet., ECF No. 67 at 34–60; Traverse, ECF No. 85 at 2–10.) In ground four, he claims the evidence was insufficient to support his conviction. (*Id.* at 60–

82.) And in ground five, Grant argues he was denied his Sixth Amendment right to present a defense. (*Id.* at 82–93.) Respondent argues the state court's denial of Grant's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 75-1.)

A. Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court

1   may also grant relief if the state court's decision was based on an unreasonable
2   determination of the facts. 28 U.S.C. § 2254(d)(2).

3        Where there is no reasoned decision from the state's highest court, the Court "looks
4   through" to the last reasoned state court decision and presumes it provides the basis for the
5   higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06
6   (1991). If the dispositive state court order does not "furnish a basis for its reasoning,"
7   federal habeas courts must conduct an independent review of the record to determine
8   whether the state court's decision is contrary to, or an unreasonable application of, clearly
9   established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)
10  (overruled on other grounds by *Andrade*, 538 U.S. at 75–76); *accord Himes v. Thompson*,
11  336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of §
12  2254(d), means "the governing principle or principles set forth by the Supreme Court at
13  the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

14       B.    Withholding Exculpatory Evidence and Presenting False Evidence
15             (Grounds One, Two, and Three)

16       In ground one, Grant alleges the prosecutor in his case violated his federal
17  constitutional rights by withholding evidence that Laymon was given a grant of immunity
18  and promises of leniency in return for his testimony at trial. (Pet., ECF No. 34–47;
19  Traverse, ECF No. 85 at 2–10.) Grant has attached to his petition a declaration by defense
20  investigator José Newman. (*See* ECF number 67-2.) In it, Newman states that he
21  interviewed Laymon at R.J. Donovan State Prison on October 31, 2018, where Laymon
22  told him the district attorney had "given [him] a deal" in exchange for his testimony at
23  Grant's trial which was not disclosed to the defense. (*Id.*) Grant claims this information
24  was not disclosed to the defense and that had it been disclosed, defense counsel would have
25  been able to expose Laymon's motivation to lie at trial. (Pet., ECF No. 34–47; Traverse,
26  ECF No. 85 at 2–10.)

27       In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that a prosecutor
28  must disclose all material evidence, including impeachment evidence, to the defendant.

3:11-cv-03015-JAH-DEB

*Brady*, 373 U.S. at 87. In order to establish a *Brady* violation, Grant must prove three elements: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld evidence was either exculpatory or impeachment; and (3) the evidence was material to the defense. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Benn v. Lambert*, 283 F.3d 1040, 1052–53 (9th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) and *United States v. Agurs*, 427 U.S. 97, 110 (1976).) "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial." *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676 and *Agurs*, 427 U.S. at 111–12). "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." *Id*. (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688–89 (9th Cir. 1986).) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Grant also alleges that the prosecutor presented false testimony at trial, namely, that Laymon did not receive any benefits in exchange for his testimony. (Pet., ECF No. 67 at 47–53; Traverse, ECF No. 85 at 2–10.) False evidence claims are governed by *Napue v. Illinois*, 360 U.S. 264 (1959). "A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016) (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008) and *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005)). If there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury" the conviction must be set aside. *Id*. at 1076 (quoting *Hayes*, 399 F.3d at 985).

Grant argues that the California Supreme Court's denial of these claims was contrary to, or an unreasonable application of, clearly established Supreme Court law. (*Id*. at 34–53.) He also contends the denial was based on an unreasonable determination of the facts.

3:11-cv-03015-JAH-DEB

(*Id*. at 53–60.) Respondent contends the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 75-1 at 11–24.)

Grant raised these claims in the habeas corpus petition he filed in the California Supreme Court after he was appointed counsel. (ECF No. 59-1.) The California Supreme Court summarily denied that petition. (ECF No. 59-2.) Accordingly, this Court must independently review the record to determine whether the state court's denial of these claims was contrary to, or an unreasonable application of, clearly established Supreme Court law, *Himes*, 336 F.3d at 853, or whether it was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

### 1.   Unreasonable Determination of the Facts (28 U.S.C § 2254(d)(2))

Grant argues the state court's summary denial of his *Brady* and *Napue* claims was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). (Pet., ECF No. 67 at 53–60; Traverse, ECF No. 85 at 2–10.) "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Ochoa v. Davis*, 16 F.4th 1314, 1325–26 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). A federal court can only conclude a factual finding is unreasonable if it is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogation on other grounds as recognized by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). Further, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "Even when a state court has issued a summary denial, the petitioner must show that there was no reasonable basis for the state court to deny relief." *Ochoa*, 16 F.4th at 1326 (citing *Richter*, 562 at 102).

/ / /

3:11-cv-03015-JAH-DEB

A summary denial of a claim by the California Supreme Court means the court concluded the petition did not state a prima facie case for relief. *People v. Duvall*, 9 Cal. 4th 464, 474–75 (1995). In *Duvall*, the California Supreme Court explained habeas corpus procedure in the state as follows:

> Because a petition for writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them.

> . . . .

> An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petition would be entitled to relief. [Citations omitted.] If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [Order to Show Cause]. [Citations omitted.]

> . . . .

> We have consistently followed this procedure when evaluating habeas corpus petitions.

*Duvall*, 9 Cal. 4th at 474–75.

Grant argues that in order for the California Supreme Court to have found he failed to state a prima facie case, the state court must have either ignored Newman's declaration entirely or "implicitly made an adverse credibility determination [regarding Laymon] without an evidentiary hearing." (Pet., ECF No. 67 at 56.) Grant further claims that "the state court's fact-finding process was fundamentally flawed because the court did not hold an evidentiary hearing or provide another mechanism for Grant to develop evidence in support of his claims." (*Id*. at 57) (internal quotations and citations omitted).

Under the procedure outlined in *Duvall*, however, the California Supreme Court is assumed to have taken Grant's factual allegations as true, namely that (1) the prosecutor withheld evidence that Laymon was given favorable treatment in exchange for his testimony, and (2) the prosecutor presented false evidence that there were no promises

3:11-cv-03015-JAH-DEB

made to Laymon in exchange for his testimony. But since the court concluded he had failed to state a prima facie case under either *Brady* or *Napue*, the court evidently found Grant had not established the evidence presented in Newman's declaration met the materiality requirement of either *Brady* or *Napue*. *Strickler*, 527 U.S. at 281–82; *Reis-Campos*, 832 F.3d at 976; *Duvall*, 9 Cal. 4th at 474–75. As discussed below in Sections IV(B)(2) and (3), the state court's decision regarding materiality was reasonable.

The state court did not make an "adverse credibility determination," nor was its fact finding "fundamentally flawed." (Pet., ECF No. 67 at 56.) Accordingly, the Court concludes the state court's denial of Grant's *Brady* and *Napue* claims was not based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

### 2. The *Brady* Claim

Next, Grant argues the state court's denial of his *Brady* claim was an unreasonable application of clearly established Supreme Court law. (Pet., ECF No. 67 at 34–47; Traverse, ECF No. 85 at 2–10.) Like the California Supreme Court, this Court will assume for purposes of analysis that Grant has established the first two elements of a *Brady* claim and that the allegations regarding undisclosed benefits given to Laymon in return for his testimony contained in Newman's declaration are true. The remaining question is whether the state court's materiality determination was an unreasonable application of clearly established Supreme Court law. As noted above, a determination of materiality for *Brady* purposes requires a court to "ask whether the prosecutor's failure to disclose the statements 'undermines confidence in the outcome' of the trial" and "'must be analyzed in the context of the entire record.'" *Ochoa*, 16 F.4th at 1330 (citing *Bagley*, 473 U.S. at 678 and *Benn*, 283 F.3d at 1053. "[The court] must assess 'the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial' to determine whether [a defendant] was prejudiced." *Id.* (quoting *Bailey v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003)).

The case against Grant turned almost exclusively on Laymon's testimony and therefore his credibility. According to Laymon, he told Rochelle and Grant he worked at

Ace Parking during a conversation on April 7, 2006, the day of the murder. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 51–56, 63–67.) Grant broached the idea of robbing Ace by stabbing the robbery victim and putting him in the trunk of a car; Grant also showed Laymon a disguise he could wear and Rochelle said he could get a gun. (*Id.*) Later that day, Rochelle called Laymon and told him he was downtown and that he would "snatch him up" as he walked to the Ace office, which Laymon took to mean Rochelle and Grant would commit a "fake robbery" and steal money from Laymon. (*Id.* 69, 159.) As Laymon was walking into the Ace offices after completing his shift, he saw Rochelle driving out of the parking lot where he knew Dawson was parked but he did not see Grant. (*Id.* at 23, 69.) As the door to the Ace office was opened, Laymon heard a loud noise and told Derrick Lyons, who had opened the door for him, that it sounded like a gunshot. (*Id.* at 36–37.) Laymon went inside and shortly thereafter Laymon's girlfriend began knocking on the office door shortly afterwards, saying someone was crying for help outside. (*Id.* at 38.) Everyone went outside and found Dawson by his car; he had been shot. (*Id.* at 39–41.) When Laymon confronted Grant the next day about the murder, Grant said, "He did not want to give up the money." (*Id.* at 74.)

Grant claims the prosecutor made a "secret deal" with Laymon to provide him with benefits in exchange for his testimony and that the deal was not disclosed to the defense. According to a declaration by defense investigator Jose Newman, during an interview with Laymon conducted by Grant's attorney and Newman in 2018, Laymon told Newman that he was "given a deal" in exchange for his testimony in Grant's case, telling him the following:

> Mr. Laymon explained that, in exchange for his testimony, the district attorney who was prosecuting Mr. Grant promised [him] that he "wouldn't get charged" with any crimes related to the incident for which Mr. Grant was on trial, that [he] would only be prosecuted for a violation of [Penal Code] section 4573.6 and "wasn't going to get much time if [he] testified," and that his sentence for violating parole "would run concurrent."

(ECF No. 67-2 at 2.)

Grant contends this "secret deal" between Laymon and the prosecutor was material to his defense because had the jury been told about the deal, Laymon's credibility would have been severely undermined, and Laymon's motive for lying would have been revealed. (Pet., ECF No. 67 at 39–47.) And, he contends, because the case against him was almost entirely circumstantial and based almost exclusively on Laymon's testimony, it is likely that the result of the trial would have been different had the deal been disclosed to the defense. (*Id.*)

There are some differences between what Laymon testified to at trial and what he told Newman in 2018. According to Newman's declaration, Laymon said the prosecutor "promised [him] that he 'wouldn't get charged' with any crimes related to the incident for which Mr. Grant was on trial." (ECF No. 67-2 at 2.) At trial, however, Laymon testified that he had not been charged with any crimes related to the murder, but he was "concerned" that he could eventually be charged. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 95; ECF No. 51-19 at 25.) He never mentioned he was "promised he wouldn't get charged." Newman's declaration also states Laymon said he was promised his sentence for violating parole "would run concurrent" to whatever sentence he received for the marijuana case. (ECF No. 67-2 at 2.) At trial, Laymon testified he "took a deal for 11 months flat" for his parole violation, but he did not say he was promised the sentence for his parole violation would run concurrent to the sentence he received for the marijuana charge. Laymon has provided documents showing the sentence he received on his marijuana charge was run concurrent to his parole violation sentence. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 178, 181, 183; ECF No. 67-3.)

But much of what Laymon testified to at trial was consistent with what Laymon told Newman. According to Newman's declaration, Laymon said the prosecutor told him he "would only be prosecuted for a violation of [Penal Code] section 4573.6 [possession of marijuana in jail or prison]  and 'wasn't going to get much time if [he] testified.'" (ECF No. 67-2 at 2.) Laymon testified at trial he was told his marijuana case "was not going to get dismissed," that he "could pretty well forget about probation," and that his sentence

"could be anywhere from two to eight years." (Pet'r's Lodgment No. 3, ECF No. 51-18 at 136.) He also testified he was hoping the District Attorney's Office would "look favorably on [him]" with regard to his marijuana case as a result of his testimony but that nothing specific had been promised to him. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 94–95, 98, 174; ECF No. 51-19 at 32.) He admitted he was "testifying to get a favor" but said he knew he was not going to get the marijuana case dismissed because "that [was] too much." (Pet'r's Lodgment No. 3, ECF No. 51-16 at 99.) Further, a defense investigator, Ernesto Zetino, testified that Laymon told him he felt pressured to give a statement to police about the case and that he thought he was going to "get lesser time or a better deal" if he testified. (Pet'r's Lodgment No. 3, ECF No. 51-21 at 129.) As Grant has noted, Laymon was eventually sentenced to two years in prison for the offense. (ECF No. 67-3.)

The differences between Laymon's testimony at trial and the statements he made to Newman are not sufficiently significant to undermine confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434. The jury was clearly aware that Laymon was testifying with the expectation of receiving favorable treatment in both the murder case and the marijuana case. Moreover, other evidence corroborated Laymon's account. Patricia Ebarb, Laymon's girlfriend, testified that after she and Laymon were released from police custody the morning after the shooting and were in their car, Laymon told her, "It was not supposed to happen like that," and that their neighbors, Rochelle and Grant, were the ones responsible for the shooting. (Pet'r's Lodgment No. 3, ECF No. 51-19 at 59–66.) Cell phone records established that Grant and Rochelle were in the downtown area around the time of the shooting. (Pet'r's Lodgment No. 3, ECF No. 51-24 at 40–103.) Based on the foregoing, this Court cannot say it was unreasonable for the state court to conclude that Grant did not meet the materiality component of *Brady*. *Bell*, 535 U.S. at 694. Grant is not entitled to relief as to this claim. 28 U.S.C. § 2254(d)(1).

### 3.   The *Napue* Claim

Grant also claims the state court's denial of his *Napue* claim was an unreasonable application of clearly established Supreme Court law. (Pet., ECF No. 67 at 47–53;

Traverse, ECF No. 85 at 2–10.) Like Grant's *Brady* claim, the Court will assume the first two elements of Grant's *Napue* claim are met and focus its inquiry on whether the false evidence Grant alleges was introduced at his trial, namely that the prosecutor made no promises to Laymon in exchange for his testimony, was material. *Reis-Campos*, 832 F.3d at 976. As noted above, if there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury" the conviction must be set aside. *Id*. at 1076 (italics added).

As the Court has noted, the jury in Grant's case was well aware that Laymon had been promised favorable treatment in both the murder case and his marijuana case as a benefit of testifying and he was extensively cross examined about his expectations of further favorable treatment for his testimony. Even if the prosecutor falsely represented the benefits Laymon was receiving in return for his testimony to the jury, the differences between what Laymon testified to at trial with regard to the benefits he was receiving and the statements he made to Newman are not significant enough to have altered the jury's assessment of Laymon's credibility, and thus there is no reasonable likelihood that the allegedly false testimony could have affected the jury's judgment. *Id*. Accordingly, the state court's conclusion that false evidence regarding Laymon's agreement with the prosecutor was not material under *Napue* was not an unreasonable application of Supreme Court law. *Bell*, 535 U.S. at 694; 28 U.S.C. § 2254(d)(1).

C.   Sufficiency of The Evidence (Ground Four)

Grant argues in ground four that insufficient evidence was presented to support his murder conviction and the firearm enhancement. (Pet., ECF No. 67 at 62–82; Traverse, ECF No. 85 at 10–11.) The California Supreme Court summarily denied Grant's petition for review. (Resp't's Lodgment No. 2, ECF No. 8-4.) Thus, this Court must "look through" to the state appellate court's opinion denying this claim as the basis for its analysis. *Ylst*, 501 U.S. at 805–06. That court wrote:

> Grant contends that the evidence was insufficient to support the jury's finding that he personally and intentionally discharged a firearm in the commission of the murder. We disagree. While the question is a close one,

there was sufficient evidence for the jury to find not only that Grant was guilty of murder, but that he *personally* discharged a firearm in committing the offense.

In evaluating a challenge to the evidence supporting a jury's verdict, "we review the whole record in the light most favorable to the judgement below to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

In performing our review of the record, we are limited by the fact that it ""'is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.'"" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) We are, thus, not permitted "to reweigh the evidence or redetermine issues of credibility" (*People v. Martinez* (2003) 113 Cal.App.4th 400, 412), and even the "uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*Scott, supra*, 21 Cal.3d at p. 296.)

In the instant case, the evidence viewed in the light most favorable to the verdict supported a reasonable conclusion that Grant and Rochelle participated in an attempted robbery that left Dawson dead, and that Grant was the shooter. [footnote omitted.] With respect to this last point, the prosecution theory was that Rochelle drove Grant to the parking lot where Dawson was killed, and dropped him off so that Grant would commit the robbery. This theory was principally supported by Laymon's testimony that he observed Dawson walking toward the office, and Rochelle driving *out* of the parking lot alone, seconds *before* Laymon (and other witnesses) heard what sounded like a gunshot. If the jury accepted this portion of Laymon's testimony, Rochelle could not have pulled the trigger, leaving Grant as the only person involved in the conspiracy to rob Ace who could have done so. Further supporting this inference, Laymon testified that when confronted with the accusation that he (Grant) had killed Dawson, Grant indicated that he knew what transpired in the Ace office parking lot during the robbery attempt — that Dawson refused to give up any money and was thus shot — something that, according to Laymon's testimony, Rochelle could not have known

firsthand. [footnoted omitted.] Finally, the prosecution evidence placed Grant in the general vicinity of the murder through cell phone records, and established that he appeared for his shift at Qualcomm unusually late: approximately an hour and a half after Dawson was shot.

We recognize that this evidence is entirely circumstantial and far from overwhelming, but whether or not we would have come to the same conclusion as the jury, the evidence, as described above, is sufficient to support the jury's verdict on appeal. (*People v. Abilez* (2007) 41 Cal.4th 472, 504 ["'"Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt"'"].) It is, of course, "'"the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."'" (*Ibid.*) Consequently, we defer, as we must, to the jury's factual conclusions and reject Grant's contention that the evidence was insufficient to support their findings. (*Scott, supra*, 21 Cal.3d at p. 296 [even the "uncorroborated testimony of a single witness is sufficient to sustain a conviction"].)

(Resp't's Lodgment No. 1, ECF No. 8-3 at 18–21.)

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation. *Id.* In assessing a sufficiency of the evidence claim, a state court must apply the standard announced by the Supreme Court in *Jackson v. Virginia*, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Moreover, under AEDPA "the standards of *Jackson* are applied 'with an additional layer of deference,' requiring the federal court to determine 'whether the decision of the [state court] reflected an "unreasonable application of" *Jackson* . . . to the facts of this case.'" *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (citing *Juan H.*, 408 F.3d at 1274–75).

3:11-cv-03015-JAH-DEB

While circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ." *Juan H.*, 408 F.3d at 1279; *see also Maquiz*, 907 F.3d at 1217–18; *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) (stating "mere suspicion or speculation cannot be the basis for logical inferences"). A federal habeas court must be "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'" *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)). Deference under AEDPA, however, "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n. 16; *Juan H.*, 408 F.3d at 1276. In order to convict a person of first degree felony murder in California, the prosecution must prove, beyond a reasonable doubt, that the murder was "'committed in the perpetration of, or attempt to perpetrate [robbery] . . . .'" *People v. Clark*, 63 Cal.4th 522, 615 (2016) (quoting *People v. Cavitt*, 33 Cal.4th 187, 197 (2004).) "'The mental state required is simply the specific intent to commit the underlying felony [citation] . . . .'" *Id.* The corresponding jury instructions, which were given in Grant's case, read as follows:

> The defendant is charged in Count One with murder, under a theory of felony murder.
>
> To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:
>
> 1.  The defendant committed or attempted to commit a robbery;
>
> 2.  The defendant intended to commit robbery;
>
> AND

/ / /

17

3.  While committing or attempting to commit robbery the defendant did an act that caused the death of another person.

A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

To decide whether the defendant committed or attempted to commit robbery, please refer to the separate instructions that I will give you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

The defendant must have intended to commit robbery before or at the time of the act causing death.

(Pet'r's Lodgment No. 1, ECF No. 51-1 at 241; CALCRIM No. 540A.)

Robbery is defined in California as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. The corresponding jury instructions, which were given in Grant's case, read as follows:

The definition of robbery is:

1.  The defendant takes property that is not his own;

2.  The property is taken from another person's possession and immediate presence;

3.  The property is taken against the person's will;

4.  The defendant uses force or fear to take the property or to prevent the person from resisting;

AND

5.  When the defendant uses force or fear to take the property, he intends to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

/ / /

The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using force or fear, then he did not commit robbery.

An act is done *against a person's will* if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

(Pet'r's Lodgment No. 1, ECF No. 51-1 at 242; CALCRIM No. 1600.)

An attempt to commit robbery under California law requires "a defendant [to take] a direct but ineffective step towards committing a robbery," and intent to commit a robbery. (Pet'r's Lodgment No. 1, ECF No. 51-1 at 239; CALCRIM No. 460.) A "direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action." (Pet'r's Lodgment No. 1, ECF No. 51-1 at 239; CALCRIM No. 460.)

According to Laymon, Grant and Rochelle told him on the day of the murder they wanted to rob Ace. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 51–55.) Laymon testified Grant did most of the talking about the plan to rob Ace; Grant suggested stabbing one of the Ace employees and putting him in a car trunk, and Rochelle said he could get a gun. (*Id.* at 60–67.) Grant also showed Laymon a wig he could wear to commit the robbery. (*Id.* at 64–67.)

Laymon testified he was working at an Ace lot with Bryan Dawson when Rochelle called him the day of the murder; Laymon missed his call. (*Id.* at 67–69.) When Laymon called Rochelle back, Rochelle told him he was "down here" and asked how much money Laymon had. (*Id.*) Cell phone data showed Grant and Rochelle were in the vicinity of the Ace parking lot at the time of the murder. (Pet'r's Lodgment No. 3, ECF No. 51-24 at 43–83.) Rochelle told Laymon that when Laymon arrived at the Ace Parking office to drop off the cash he had collected, they would "snatch him up." (*Id.* at 69.) Laymon testified he thought he was going to be the victim of a fake robbery by Rochelle and Grant. (*Id.* at 69–72.) Viewing the evidence in the light most favorable to the prosecution, this evidence,

3:11-cv-03015-JAH-DEB

taken together, is sufficient for a rational jury to conclude that Grant had the intent to commit a robbery. *Jackson*, 443 U.S. at 319.

Laymon finished working and then drove with his girlfriend Patricia Ebarb to the Ace office and parked across the street. (Pet'r's Lodgment No. 3, ECF No. 51-24 at 31–32.) Dawson also drove back to the Ace office in his own car. (*Id.*) As Laymon was walking into the Ace office, he saw Rochelle driving out of the parking lot where Laymon had seen Dawson moments before. (*Id.* at 33, 69–72.) Laymon knocked on the door to the office and as it was opened he heard a loud noise which sounded like a gunshot. (*Id.* at 36–37.) Shortly thereafter, Ebarb banged on the door, saying that someone was crying for help outside. (*Id.* at 37–38.) Dawson was found next to his car bleeding from a gunshot wound. (*Id.* at 40–41.) An envelope with money inside was found on top of Dawson's car. (Pet'r's Lodgment No. 1, ECF No. 51-15 at 134.) Laymon never saw Grant at the scene of the murder. (*Id.* at 71–72.) But the next day when he learned that Dawson had died, he confronted Rochelle and Grant at their apartment. (*Id.* 73–74.) Grant replied, "He did not want to give up the money." (*Id*. at 74.) A rational jury could conclude from this evidence that Grant followed through on his stated desire and attempted to rob Ace Parking by confronting Dawson in the parking lot. *Jackson*, 443 U.S. at 319. Further, a rational jury could conclude from this evidence that it was Grant who personally used the firearm. A rational jury could conclude that Rochelle could not have shot Dawson because Laymon saw him in a car driving away from the parking lot where the shooting occurred at the time Dawson was shot. (Pet'r's Lodgment No. 3, ECF No. 51-24 at 31–32.) And, Grant had previously expressed a willingness to use violence to commit the robbery when he suggested they would stab the robbery victim and put him in the trunk of a car. (Pet'r's Lodgment No. 3, ECF No. 51-16 at 60–67.)

To be sure, the evidence supporting Grant's conviction was far from overwhelming. It rests almost entirely on Laymon's testimony and that testimony consists in large part of circumstantial evidence that Grant was committed the attempted robbery and murder and

was in fact the shooter.[2] Nevertheless, given the deference this Court must show under *Jackson*, the Court cannot say the state appellate court's application of *Jackson* was unreasonable. Accordingly, the Court concludes that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Grant is not entitled to relief as to this claim.

      D.    <u>Sixth Amendment Right to Present a Defense (Ground Five)</u>

In ground five, Grant alleges his sixth amendment right to present a defense was violated when the trial court excluded evidence of Grant's demeanor at his police interview. (Pet., ECF No. 67 at 82–95; Traverse, ECF No. 85 at 11.) Specifically, Grant sought to introduce evidence that he appeared to be "unconcerned" when told that the murder of Dawson was videotaped. (*Id.*) Respondent argues state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 75-1 at 25–31.)

Grant contends that AEDPA deference does not apply to this claim because the state appellate court did not directly address the federal constitutional claim raised by Grant, but rather decided the claim solely on state law grounds. (Pet., ECF No. 67 at 83–87; Traverse, ECF No. 85 at 11.) "In *Harrington v. Richter* [citations omitted], the Supreme Court held that a reviewing federal court should presume that the last reasoned decision of the state court adjudicated all raised claims on the merits and is entitled to deference pursuant to . . . AEDPA . . . ." *Phillips v. Herndon*, 730 F.3d 733, 775 (9th Cir. 2013.) In *Johnson v. Williams*, 568 U.S. 289 (2013), the Supreme Court recognized an exception to this rule

---

[2] Grant suggests that the jury could not have relied on Laymon's testimony as the sole basis for their decision because Laymon was an accomplice and such testimony requires corroboration under California law. (Pet., ECF No. 67 at 75–76.) As Respondents note, however, California's rule requiring corroboration of an accomplice's testimony is not required by the federal constitution, and thus cannot form the basis for relief under 28 U.S.C. § 2254. *See Estelle v. McGuire*, 502 U.S. 62, 67 68 (1991) (holding that federal habeas relief is not available for alleged violations of state law).

where "a state court rejects a federal claim without expressly addressing that claim." *Id.* at 1096. In such circumstances, "a federal habeas court must presume that the federal claim was adjudicated on the merits — but that presumption can in some limited circumstances be rebutted." *Id.*

As Respondent points out, the state appellate court expressly rejected Grant's federal Constitutional claim by stating "we also reject Grant's contention that even if the statements were properly excluded under the evidence code, the trial court was required to admit them by the state or federal Constitution. There is no constitutional requirement to admit unreliable hearsay." (Resp't's Lodgment No. 1, ECF No. 8-3 at 24, fn. 12). Further, the appellate court cited *People v. Edwards*, 54 Cal. 3d 787, 820 (1991) as support for its conclusion. In *Edwards*, as respondent notes, the California Supreme Court expressly relied on United States Supreme Court cases in deciding that "[t]here is no constitutional requirement to admit unreliable hearsay," including *Green v. Georgia*, 442 U.S. 95 (1979), "which held that reliable hearsay must be admitted at the penalty phase of a capital trial even if the state rules of evidence provide otherwise," and *Rock v. Arkansas*, 483 U.S. 44 (1987), stating that state evidentiary rules cannot be applied arbitrarily. *Edwards*, 54 Cal. 3d at 820; ECF No. 8-3 at 24. Accordingly, the Court concludes the last reasoned state court decision, the state appellate court's opinion on direct review, is entitled to AEDPA deference. *Ylst*, 501 U.S. 797, 805–06. That court wrote:

> In analyzing Grant's contention, we find guidance in our Supreme Court's decision on analogous facts in *People v. Edwards* (1991) 54 Cal.3d 787 (*Edwards*). In that case, the high court held that the trial court did not abuse its discretion in declining to admit, as untrustworthy under Evidence Code section 1252, a defendant's postcrime statement in the context of a police investigation. (*Edwards*, at p. 820.) The court emphasized that a defendant "'may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination.'" (*Ibid.*) To avoid such a circumstance, Evidence Code section 1252 requires that "statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are '"made at a time when there was no motive to deceive."'" (*Edwards*, at p. 820.)

1
2
3
4
5
6
7
8

As in *Edwards*, Grant's out-of-court statement to police officers in the instant case, as well as any "nonverbal conduct" similarly indicating a lack of concern (Evid.Code, § 225), did not have sufficient indicia of trustworthiness to require admission under Evidence Code section 1252. Instead, Grant made the proffered "statements" at a time when he was under suspicion for murder. Consequently, Grant "had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shooting," and "[t]here was 'ample ground to suspect defendant's motives and sincerity' when he made the statements." (*Edwards*, *supra*, 54 Cal.3d at p. 820.) "The need for cross-examination is especially strong in this situation, and fully warrants exclusion of the hearsay evidence." (Ibid.)

9
10
11
12
13
14
15
16
17

In sum, as in *Edwards*, the proffered evidence did not contain sufficient indicia of trustworthiness to mandate its admission under Evidence Code section 1252, and thus the trial court acted within its discretion in excluding it. [Footnote 12: We also reject Grant's contention that even if the statements were properly excluded under the Evidence Code, the trial court was required to admit them by the state or federal Constitution. There is no constitutional requirement to admit unreliable hearsay. (*Edwards*, *supra*, 54 Cal.3d at p. 820.) Grant's additional argument that California's constitutional "truth-in-evidence provision" mandated admission of the statement fails because that provision specifically states that it does not "affect any existing statutory rule of evidence relating to privilege or hearsay." (Cal . Const., art. I, § 28, subd. (d).)].

18

(Resp't's Lodgment No. 1, ECF No. 8-3 at 23–24.)

19
20
21
22
23
24
25
26
27
28

Clearly established federal law holds that the right to present evidence and witnesses is essential to due process and is guaranteed by the compulsory process clause of the Sixth Amendment. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Dunham v. Deeds*, 954 F.2d 1501, 1503 (9th Cir. 1992). "The defendant's right to present evidence[, however,]. . . is not absolute," *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983), and there exists no "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410. A defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." The

exclusion of defense evidence is error only if it renders the state proceeding so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. at 67; *Bueno v. Hallahan*, 988 F.2d 86, 87 (9th Cir. 1993).

As Respondent has noted, the Supreme Court "has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard for evaluating such exclusions." *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011), citing *Moses v. Payne*, 555 F.3d 742, 749 (9th Cir. 2009). Without any such precedent, the state court's rejection of this claim cannot be found have been contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006); 28 U.S.C. § 2254; *Smith v. Small*, No. 14-56482, 697 Fed. Appx. 538 (9th Cir. 2017); *Coleman v. Knipp*, No. 10-17219, 2011 WL 5032827, at **1 (9th Cir. 2011).

Even if this Court were to consider whether the exclusion of Grant's reaction to police statements about the supposed videotape of the crime violated his federal Constitutional rights, Grant has not established his trial was "so fundamentally unfair as to violate due process." *Estelle*, 502 U.S. at 67. The evidence Grant sought to introduce was not particularly probative or reliable. *See Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990). While Grant claimed he was not involved in the robbery or murder, and his lack of concern after being confronted by police with a possible videotape of the crime tended to support this, there are other reasons Grant could have exhibited his unconcerned demeanor, such as a desire to cover up his involvement in the crime. Further, given that Grant was being interrogated by police at the time he reacted to the revelation of a possible videotape of the crime, his reaction was not a particularly reliable piece of evidence since he would have been highly motivated to cover up any adverse reaction to this information if he had been involved. *Id.* And while the evidence of Grant's reaction would certainly have been capable of evaluation by the jury, it was not the sole evidence on the issue or a major part of his defense. *Id.* Grant could have testified in his own defense and his lack of reaction to police claims of a videotape would have been only a small part of his defense. The bulk of

Grant's defense rested on impeaching Laymon as a witness and focusing on the lack of physical evidence or eyewitness testimony linking him to the crime.

On the other hand, the state's interest in excluding hearsay evidence is well-established. As the Ninth Circuit noted in *Perry*:

> Due process draws a boundary beyond which state rules cannot stray; it does not displace the law of evidence with a constitutional balancing test. State rules are designed not to frustrate justice, but to promote it. Our common rules of evidence — testimonial privileges, the hearsay rule — have been justified by long experience. *Chambers*, 410 U.S. at 298, 93 S.Ct. at 1047; *Washington*, 388 U.S. at 24, 87 S.Ct. at 1926 (Harlan, J., concurring). The state interests which they embody have already been weighed and found to be compelling; only the most urgent considerations, such as those in *Chambers*, can outweigh them. A defendant must show that his interest clearly outweighs the state's before we will interfere with routine procedural matters. *Accord Britton v. Rogers*, 631 F.2d 572, 580 (8th Cir. 1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).

*Perry*, 713 F.3d at 1453.

Further, because the prosecution's case relied almost entirely on Laymon's testimony, the essential question was whether the jury believed Laymon's version of events. Grant's attorney thoroughly cross examined and impeached Laymon at trial and yet the jury believed Laymon and convicted Grant. Grant's reaction to police claims of a videotape was not so compelling that it would have changed the jury's evaluation of Laymon's testimony.

The exclusion of Grant's reaction did not render his trial fundamentally unfair "fundamentally unfair." *Estelle*, 502 U.S. at 67. Accordingly, the Court concludes that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Grant is not entitled to relief as to this claim.

/ / /

/ / /

## V.  CONCLUSION

For the foregoing reasons, the Court **DENIES** the Petition. Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254 (West 2019). A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (West 2019); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th  Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, the Court concludes that reasonable jurists could not find the constitutional claims debatable, and therefore a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 1, 2022

_____

John A. Houston
United States District Judge